# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |  |
|---|---|---|
| In the Matter of the Search of:<br>Information associated with accounts identified as<br>slifer999 (ESP User ID slifer999_4ow) and pouchair<br>that are within the possession, custody, or control of<br>MediaLab.AI Inc. | ) ) ) ) ) ) ) | Case No.  2:22-MJ-02568 |

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A-4*

There are now concealed or contained the items described below:

*See Attachment B-4*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
□ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| *See Attachment B-4* | |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*

Bethany Owens, Special Agent, Homeland
Security Investigations
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State:   Los Angeles, CA

_____
*Judge's signature*

Hon. Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

AUSA: Claire E. Kelly (x3868)

## ATTACHMENT A-4

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the SUBJECT ACCOUNTS identified as slifer999, with ESP User ID slifer999_4ow ("KIK ACCOUNT 1") and pouchair ("KIK ACCOUNT 2") (each a "SUBJECT ACCOUNT," collectively the "SUBJECT ACCOUNTS") that are within the possession, custody, or control of MediaLab.AI Inc., a company that accepts service of legal process at 1237 7th Street, Santa Monica, California 90401, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B-4**

**ITEMS TO BE SEIZED**

I.   **SEARCH PROCEDURES**

1.   The warrant will be presented to personnel of MediaLab.AI Inc., (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.   To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.   The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.   With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other

88

sophisticated techniques, including to search for known images of child pornography.  The review of the electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.    The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.    Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data

from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   <u>INFORMATION TO BE DISCLOSED BY THE PROVIDER</u>

10.   To the extent that the information described in Attachment A-4 is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A-4:

a.   All contents of all wire and electronic communications associated with KIK ACCOUNT 1 (limited to that which occurred between January 1, 2021, and the date of this warrant), and KIK ACCOUNT 2 (limited to that which occurred between July 31, 2018, and the date of this warrant ),[36] including:

---

[36] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this

*(footnote cont'd on next page)*

i.   All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, draft messages, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each email or message (including the actual IP addresses of the sender and recipients of the emails), and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

b.   All other records and information, including:

i.   All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or email addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other

---

date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

        (I)  The SUBJECT ACCOUNTS.

        ii.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

## III.  INFORMATION TO BE SEIZED BY THE GOVERNMENT

    11.  For each SUBJECT ACCOUNT listed in Attachment A-4, the search team may seize:

        a.  All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (Receipt and Distribution of Child Pornography), 2252A(a)(5)(B)

(Possession of Child Pornography), and 2251(a)(e) (Production of Child Pornography) (the "SUBJECT OFFENSES"), namely:

i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNTS, including records about their identities and whereabouts.

ii.   Information related to how and when the SUBJECT ACCOUNT was accessed or used;

iii. Any messages, records, documents, or material that identify the user(s) of the SUBJECT ACCOUNTS.

iv.   Child pornography, as defined in 18 U.S.C. § 2256(8).

v.   Any files, records, or messages that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

vi.   Any files, records, or messages that refer to any of the PROVIDERS, or any accounts with the PROVIDERS,

vii. Any files, records, or messages sent to or from the PROVIDERS.

viii.   Any files, records, or messages tending to identify persons involved in the possession, receipt,

93

distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

ix.  Any files, records, or messages that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

x.   Any and all files, records, or messages which are sexually arousing to individuals who are interested in minors.  Such material is commonly known as "child erotica" and includes images of children, written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disordered, pedophilia, nudist publications, diaries, and fantasy writings.

xi.  Any and all files, records, or messages pertaining to and/or describing sadistic or violent conduct towards minors.

xii. Any files, records, or messages that pertain to accounts with any Internet Service Provider or any Electronic Service Providers.

          xiii.     Any passwords, encryption keys, and other access devices that may be necessary to access folders and files in the SUBJECT ACCOUNTS.

          xiv. Information relating to co-conspirators also engaged in the Subject Offenses, which could include information relating to their identities, whereabouts, communications, and methods of contact and communication.

     b.   All records and information described above in Section II.10.b.

## IV.  PROVIDER PROCEDURES

12.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  Notwithstanding 18 U.S.C. § 2252/2252A or any similar statute or code, the provider shall disclose responsive data by sending it to the following address via US Mail, or to the following email address:

        Bethany Owens
        501 West Ocean Boulevard, STE 7200
        Long Beach, CA 90802
        Phone:  562-477-8134
        Email:  Bethany.A.Owens@ice.dhs.gov

13.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

95

**AFFIDAVIT**

I, BETHANY A. OWENS, being duly sworn, declare and state as
follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the United States
Department of Homeland Security ("DHS"), Immigration and Customs
Enforcement ("ICE"), Homeland Security Investigations ("HSI"),
and have been so employed since September 2019.  I am currently
assigned to the HSI Los Angeles Child Exploitation Task Force,
where I investigate criminal violations relating to child
exploitation and production, distribution, receipt and
possession of child pornography, in violation of 18 U.S.C.
§§ 2252A.  I have received training in the areas of child
pornography and child exploitation and have observed and
reviewed various examples of child pornography, including in the
form of computer media.

2.   I have assisted in conducting criminal investigations
relating to subjects who use the Internet and two-way
communication devices, such as cellular telephones, to commit
crimes in violation of 18 U.S.C. §§ 2252A.  I have also
participated in the execution of numerous search warrants, many
of which involved child exploitation and/or child pornography
offenses.  I make this affidavit based upon my personal
knowledge and experience, my review of pertinent documentation,
and discussions with other law enforcement officers.

3.   Through my training and my experience, I have become
familiar with the methods of operation used by people who commit

1

offenses involving the sexual exploitation of children.  I have attended training classes concerning computer crimes and the sexual exploitation of children on the Internet.  This training and my experience in investigations has given me an understanding of how people involved with offenses relating to the sexual exploitation of children use the Internet to further those offenses.

## II.  <u>PURPOSE OF AFFIDAVIT</u>

1.   I make this affidavit in support of an application for a warrant for information associated with the accounts identified as follows (collectively, the "SUBJECT ACCOUNTS"):

> a.   hermanlogo23@gmail.com ("GOOGLE ACCOUNT 1");
>
> b.   chavezbryan1996@gmail.com ("GOOGLE ACCOUNT 2");
>
> c.   batman118264@gmail.com ("GOOGLE ACCOUNT 3");(with GOOGLE ACCOUNTS 1 through 3, the "GOOGLE ACCOUNTS");
>
> d.   Screenname/username "alex217543" (the "SKYPE ACCOUNT");
>
> e.   Screenname/username "New_EraKid" (the "TWITTER ACCOUNT");
>
> f.   Screenname/username "slifer999" ("KIK ACCOUNT 1");
>
> g.   Screenname/username "pouchair" ("KIK ACCOUNT 2") (with KIK ACCOUNT 1, the "KIK ACCOUNTS"); and
>
> h.   Screenname/username "Alex Gee" (the "ZOOM ACCOUNT").

2.   The SUBJECT ACCOUNTS are controlled by the following providers (collectively, the "PROVIDERS"):

a.   The GOOGLE ACCOUNTS are controlled by Google LLC, which is headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043;

b.   The SKYPE ACCOUNT is controlled by Microsoft Corporation, which is headquartered at 1 Microsoft Way, Redmond, Washington 98052;

c.   The TWITTER ACCOUNT is controlled by Twitter, Inc., which is headquartered at 1355 Market Street, Suite 900, San Francisco, California, 94103;

d.   The KIK ACCOUNTS are controlled by MediaLab.AI Inc. ("MediaLab"), which is headquartered at 1237 7th Street, Santa Monica, California 90401; and

e.   The ZOOM ACCOUNT is controlled by Zoom Video Communications, Inc. ("Zoom"), which is headquartered at 55 Almaden Blvd, 6th Floor, San Jose, California 95113.[1]

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDERS pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).  See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes - - (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

3.    The information to be searched is described in
Attachments A-1, A-2, A-3, A-4, and A-5.   This affidavit is made
in support of an application for a warrant under 18 U.S.C.
§§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require
the PROVIDERS to disclose to the government copies of the
information (including the content of communications) described
in Section II of Attachments B-1, B-2, B-3, B-4, and B-5.   Upon
receipt of the information described in Section II of
Attachments B-1, B-2, B-3, B-4, and B-5, law enforcement agents
and/or individuals assisting law enforcement and acting at their
direction will review that information to locate the items
described in Section III of Attachments B-1, B-2, B-3, B-4, and
B-5.   Attachments A-1, A-2, A-3, A-4, and A-5 and B-1, B-2, B-3,
B-4, and B-5 are incorporated herein by reference.

7.    As described more fully below, I respectfully submit
there is probable cause to believe that the information
associated with the SUBJECT ACCOUNTS constitutes evidence,

---

[2] The government is seeking non-content records pursuant to
18 U.S.C. § 2703(d).   To obtain the basic subscriber
information, which does not contain content, the government
needs only a subpoena.   See 18 U.S.C. § 2703(c)(1), (c)(2).   To
obtain additional records and other information--but not
content--pertaining to subscribers of an electronic
communications service or remote computing service, the
government must comply with the dictates of section
2703(c)(1)(B), which requires the government to supply specific
and articulable facts showing that there are reasonable grounds
to believe that the records or other information sought are
relevant and material to an ongoing criminal investigation in
order to obtain an order pursuant to 18 U.S.C. § 2703(d).   The
requested warrant calls for both records containing content (see
Attachments B-1, B-2, B-3, B-4, and B-5, paragraph II.10.a.) as
well as subscriber records and other records and information
that do not contain content (see Attachments B-1, B-2, B-3, B-4,
and B-5, paragraph II.10.b.).

contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. §§ 2252A(a)(2) (Receipt and Distribution of Child Pornography), 2252A(a)(5)(B) (Possession of Child Pornography), and 2251(a)(e) (Production of Child Pornography) (collectively, the "SUBJECT OFFENSES").

8. The facts set forth in this affidavit are based upon my personal observations, my training and experience, the training and experience of more experienced law enforcement agents, with whom I have discussed this case, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND ON INTERNET PROTOCOL ADDRESSES, AND CYBERTIPS OBTAINED BY THE NATIONAL CENTER FOR MISSING AND EXPLOITED CHILDREN**

9. An Internet Protocol ("IP") address is a unique numeric address used by computers on the Internet. An IP address is generally a series of four or eight sets of numbers, each in the range 0-255, separated by periods or colons (e.g., 121.56.97.178, 2600:1700:ddb0:db50:6168:4f35:f8a7:315c). Every computer connected to the Internet is assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.

Most Internet Service Providers ("ISPs") control a range of IP addresses.  Some computers have static IP addresses (IP addresses that are assigned for a long period of time) while other computers have dynamic IP addresses (short-term IP addresses that frequently change).  From my training and experience, I know that any computer that accesses the Internet must do so through an ISP.  The ISP identifies the computer during the connection session by assigning it an IP address.

10.  There are two versions of IP addresses:  IPv4 and IPv6.  IPv4 is the most widely used IP, and uses four groups of numbers separated by periods in a 32-bit address scheme (e.g., 121.56.97.178).  IPv6 uses colons to separate eight alphanumeric groups (e.g., 2001:0:1760:e3e7:1858:2cea:d075:6c4c).  In a simple example, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.  What is more typical is that one home may connect multiple digital devices to the internet simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems. Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home connect to the Internet via a router or hub.  The devices connect to the router or hub, and the hub connects to the Internet.  Internet activity from every device attached to the router or hub is using the same external IP Address assigned by the ISP.  The router or hub "routes" Internet traffic so that it reaches the proper device.

Most ISPs control a range of IP Addresses.  Most ISPs maintain
records of which subscriber was assigned to which IP Address
during an online session.

11.  The National Center for Missing and Exploited Children
("NCMEC") was established in 1984 as a private, nonprofit
organization.  NCMEC provides services nationwide for families
and professionals concerning abducted, endangered, and sexually
exploited children.  Under its mission and its congressional
authorization, NCMEC operates a Cybertip line, which is
essentially a forum for private citizens and businesses to
report information concerning the mission of NCMEC, including
the sexual exploitation of children.

12.  Under 18 U.S.C. § 2258A, if an ISP such as the
PROVIDERS locates the presence of child pornography in a user's
account with a PROVIDER, a Cybertip Report (a "Cybertip") must
be submitted to NCMEC.  While ISPs such as the PROVIDERS will
report the presence of any child pornography they find to NCMEC,
they do not conduct an exhaustive search of, for example, a
user's email account or cloud storage.  Instead, they typically
use some automated method for locating images of suspected child
pornography.  This may include the use of automated technologies
that compare the hash values of images contained in the user's
account to the hash values of known images of child pornography.

13.  When NCMEC receives a Cybertip concerning the sexual
exploitation of children, NCMEC analysts conduct preliminary
research to determine the possible location of the incident, and

then forward the information to the appropriate Internet Crimes
Against Children task force or the appropriate law enforcement
agency for a follow-up investigation.

### III.  **SUMMARY OF PROBABLE CAUSE**

14.  HSI and the Federal Bureau of Investigation ("FBI")
learned of a Cybertip that had been submitted to NCMEC linking
GOOGLE ACCOUNT 1 and KIK ACCOUNT 1 to suspected child
pornography.  The subscriber of the IP address that was most
often used to upload the suspected child pornography files was
assigned to Juan Chavez ("J. CHAVEZ") and the physical address
associated with this IP Address was J. CHAVEZ's residence
located at 5853 Estrella Avenue, Los Angeles, California 90044
(the "SUBJECT PREMISES").  The remaining IP addresses used to
upload the suspected child pornography belonged to T-Mobile, a
mobile telecommunication company.

15.  In November of 2021, a federal search warrant was
executed at the SUBJECT PREMISES.  While previewing multiple
digital devices on scene pursuant to the search warrant,
investigators found suspected child pornography on digital
devices that appear to belong to BRYAN CHAVEZ ("B. CHAVEZ").
Investigators also discovered that B. CHAVEZ lives at the
SUBJECT PREMISES.

16.  Upon forensic review of three digital devices (SUBJECT
DEVICES 1, 2, and 3, collectively the "SUBJECT DEVICES") that
all appeared to be associated with B. CHAVEZ and that were found
during the search of the SUBJECT PREMISES, law enforcement found

8

files of suspected child pornography.  Some of this child
pornography appeared to depict victims who were a few months old
and younger.  I submitted approximately 370 files to NCMEC to be
compared with their Child Recognition and Identification System
("CRIS").  NCMEC confirmed that of these submitted files,
approximately 15 images and 94 videos match known victims in
CRIS who were minors at the time the child pornography was
produced.  Additionally, approximately 36 files of suspected
child pornography contain apparent minors who have yet to be
identified.[3]  One additional partial video file appears to depict
an individual who resembles B. CHAVEZ licking the upper thigh of
a partially clothed minor who appears to be between the ages of
approximately four and six.[4]

17.  Through the law enforcement review of the SUBJECT
DEVICES, law enforcement found email, communication, and social
media accounts (the SUBJECT ACCOUNTS) apparently used by B.
CHAVEZ or registered to accounts apparently used by B. CHAVEZ.
These included KIK ACCOUNT 1 (used to upload and distribute
child pornography) and GOOGLE ACCOUNT 1 (the email account
associated with KIK ACCOUNT 1).  SUBJECT DEVICES 1 and 2 also

---

[3] These files appear to be newer productions as some of them
had not been seen before by NCMEC and others have only been seen
several times.  The rest of these files contain apparent minors
and offenders who have not yet been identified by law
enforcement or NCMEC.

[4] While this file likely does not meet the definition of
child pornography on its own, this depiction and B. CHAVEZ's
possession of such depiction is evidence of a sexual interest in
children.

included Zoom and Skype[5] chats in which users (including the
SKYPE ACCOUNT) discussed sexually assaulting, torturing, and
killing babies.

18.  Some of the SUBJECT ACCOUNTS are associated with child
pornography and child exploitation, and/or are connected to
other SUBJECT ACCOUNTS, as follows:

    a.  **hermanlogo23@gmail.com** (GOOGLE ACCOUNT 1): Email
account listed in subscriber information for KIK ACCOUNT 1
according to the Cybertip.  KIK ACCOUNT 1 was used to upload and
distribute suspected child pornography according to the
Cybertip.

    b.  **chavezbryan1996@gmail.com** (GOOGLE ACCOUNT 2):
Email account reported to be associated with the SKYPE ACCOUNT.
One of the SUBJECT DEVICES was reported to contain a chat in
which the user of the SKYPE ACCOUNT discussed sexually
assaulting children.

    c.  **batman118264@gmail.com** (GOOGLE ACCOUNT 3): Email
account reported to be associated with the ZOOM ACCOUNT.
Suspected child pornography found on one of the SUBJECT DEVICES
was reported to be located in a file folder whose file name
referenced the ZOOM ACCOUNT.

    d.  **Screenname/username "alex217543"** (the SKYPE
ACCOUNT): Skype account that reportedly included discussions of

---

[5] From my training and experience, I am aware that Zoom and
Skype are applications that allow users to communicate via chat
or audio/video conferencing.

the sexual assault of children.  In one Skype chat, it appears this user claims to have molested his or her niece.

> e.  **Screenname/username "New_EraKid"** (the TWITTER ACCOUNT): Investigators found suspected child pornography on one of the SUBJECT DEVICES that, based on the reported location of the files, appears to have been obtained or distributed using Twitter, although the evidence did not indicate which Twitter account received or distributed the files.  The TWITTER ACCOUNT appears to be used by B. CHAVEZ because the forensic report of one of the SUBJECT DEVICES showed an email that included the following text: "We noticed a recent login for your account @New_EraKid."

> f.  **Screenname/username "slifer999"** (KIK ACCOUNT 1): Account identified in the Cybertip as being used to upload and distribute approximately 69 files of suspected child pornography to Kik Messenger.

> g.  **Screenname/username "pouchair"** (KIK ACCOUNT 2): Evidence on one of the SUBJECT DEVICES reportedly shows that GOOGLE ACCOUNT 3 was used to sign up for KIK ACCOUNT 2.  In light of evidence that B. CHAVEZ uses a wide range of electronic communication applications (including to discuss child exploitation with like-minded individuals), and the fact that it appears he used Kik Messenger to upload and distribute suspected child pornography (through KIK ACCOUNT 1), there is probable cause that evidence of the SUBJECT OFFENSES will also be found on this second KIK ACCOUNT.

h.   **Screenname/username "Alex Gee"** (the ZOOM ACCOUNT): Suspected child pornography found on SUBJECT DEVICE 1 was reportedly located in a file folder whose file name appeared to indicate this child pornography was downloaded and/or distributed in a Zoom chat involving the ZOOM ACCOUNT.

19.   Based on my training and experience and the evidence in this case, including what appears to be B. CHAVEZ's use of a wide range of electronic accounts for discussing, receiving, and distributing child pornography, there is probable cause that evidence of the SUBJECT OFFENSES will be found on the SUBJECT ACCOUNTS.

## IV.   STATEMENT OF PROBABLE CAUSE

### A. HSI and FBI Receive NCMEC CyberTip Report Concerning the Uploading and Distribution of Child Pornography

20.   On or about June 3, 2021, SA Tim Alon reviewed Cybertip Report #91769445 (the "Cybertip") and associated files that MediaLab[6] sent to NCMEC on or about May 30, 2021.  According to the Cybertip, Kik Messenger[7] user "slifer999" uploaded to Kik between or about April 12, 2021, and April 29, 2021, approximately 69 files using the account "slifer999" ("KIK

---

[6] MediaLab.AI Inc., also known as MediaLab, owns Kik Messenger.

[7] Based on my training and experience, I am aware that Kik Messenger, also known as "Kik," is a free instant messenger application for mobile devices (i.e., smart phones, tablets, etc.).  The Kik application uses the Internet connection through the mobile devices' cellular data plan or through wi-fi to send and receive messages, photos, videos, and other content between Kik users.  A Kik user chooses a unique username for their account when registering their account in the application.  Kik allows users to search for other users by username.

ACCOUNT 1") that MediaLab identified as child sexual exploitative material.  In the Cybertip, MediaLab confirmed that it had viewed the files in question and that the files had been sent by the user in either private or group messages.  SA Alon reviewed the files on or about June 3, 2021, and confirmed all of them appeared to include content containing the sexual exploitation of children.  Most of the content relates to the sexual exploitation of toddlers and babies.  The following are examples of the content SA Alon viewed:

       a.   "0d07f611-0f1b-48fa-9559-eeee1091244f.jpg" – This image appears to depict a female baby lying on her back with her legs spread.  Her genitals are exposed.  An erect penis is touching her genitals.

       b.   "0a8fef35-e3e8-486a-b1f6-c07150f34779.mp4" – This video appears to depict a female toddler lying on her back naked.  An adult male attempts to penetrate her genitals with his erect penis.  He ejaculates on her stomach.

       c.   "0df4b5f6-9740-4e52-97ba-7edbfef8bdef.mp4" – This video appears to depict a female toddler lying on her back with her legs spread.  Her genitals are exposed.  An adult male rubs his erect penis on her genitals and anus.

       d.   "6b4bfc5d-c75e-414b-a0cb-7f4d768354c2.mp4" – this video appears to depict a naked baby lying on his or her stomach.  An adult male attempts to penetrate the baby's anus with his erect penis.

13

21.   According to the Cybertip, MediaLab provided the following subscriber information for KIK ACCOUNT 1:

a.   Email Address: hermanlogo23@gmail.com (GOOGLE ACCOUNT 1)[8]

b.   Screen/User Name: slifer999

c.   ESP User ID: slifer999_4ow

d.   IP Address: 75.54.116.228 (the "Target IP Address") (Login) 04-30-2021 05:38:59 UTC

**B. Investigators Identify the Subscriber of the Target IP Address That Uploaded the Child Pornography to Kik**

22.   According to the Cybertip, the suspected child pornography was uploaded approximately 37 times using the Target IP Address.  Database checks showed that the Target IP Address was registered to internet service provider AT&T U-verse.  The remaining IP addresses used to upload the suspected child pornography were associated with T-Mobile.

23.   On or about June 8, 2021, SA Alon obtained subscriber information from AT&T for the Target IP Address.  According to AT&T, the subscriber of the Target IP Address was J. CHAVEZ at the SUBJECT PREMISES.

24.   In June 2021, SA Alon confirmed that the SUBJECT PREMISES is listed as J. CHAVEZ's address according to the

---

[8] Because KIK ACCOUNT 1, which is associated with GOOGLE ACCOUNT 1, uploaded the suspected child pornography files in or about April 2021, I am seeking contents of all wire and electronic communications associated with KIK ACCOUNT 1 and GOOGLE ACCOUNT 1 which occurred between January 1, 2021 (approximately three months before the uploads) and the date of this warrant, as described in Attachments B-1 and B-4, Section II.10a.

14

California Employment Development Department database and California DMV.

25.   In September 2021, law enforcement conducted surveillance at the SUBJECT PREMISES and reported that they saw a person who appeared to match a California DMV photo of J. CHAVEZ.

26.   On or about October 27, 2021, an HSI criminal analyst reviewed DMV records and publicly accessible records and found multiple additional individuals that possibly resided at the SUBJECT PREMISES, including B. CHAVEZ.

**C. Execution of a Search Warrant at the SUBJECT PREMISES**

27.   On October 29, 2021, the Honorable Michael R. Wilner, United States Magistrate Judge, issued a search warrant for the SUBJECT PREMISES in case number 2:21-MJ-04982 (the "October 2021 Warrant"), for offenses relating to possession, receipt, and distribution of child pornography.  The warrant and the affidavit underlying the warrant are incorporated herein by reference.  Among other evidence, the warrant authorized the search and seizure of all digital devices found on the SUBJECT PREMISES which were themselves or which contained evidence, contraband, fruits, or instrumentalities of the target child pornography offenses, and forensic copies thereof.

28.   On or about November 3, 2021, law enforcement executed the warrant at the SUBJECT PREMISES.  Both B. CHAVEZ and J. CHAVEZ, among others, were present at the SUBJECT PREMISES when the October 2021 warrant was executed.

15

29.   During the search warrant execution, SA Alon and I
conducted a consensual interview of B. CHAVEZ at the SUBJECT
PREMISES.  The interview was conducted in a bedroom in the
residence.  B. CHAVEZ was informed the interview was being
recorded, and sat in a chair closest to the door of the bedroom.
SA Alon and I did not have any weapons or law enforcement
insignia displayed, although we introduced ourselves to
B. CHAVEZ as law enforcement officers.  Law enforcement told
B. CHAVEZ that he was free to terminate the interview at any
time and that law enforcement did not have an arrest warrant.
At the conclusion of the interview law enforcement did not
arrest B. CHAVEZ.

30.   Law enforcement informed B. CHAVEZ that the interview
was consensual and that he did not have to answer any questions
he did not wish to.  At the beginning of the interview,
B. CHAVEZ was given a copy of ICE Form 73-025, Statement of
Rights, as well as a copy of the search warrant.  B. CHAVEZ
stated he did not mind speaking with investigators.  B. CHAVEZ
did not sign the Statement of Rights form, and SA Alon and I did
not read the rights listed on the form to B. CHAVEZ.

31.   During this interview, B. CHAVEZ stated he had lived
at the SUBJECT PREMISES for most of his life.  B. CHAVEZ
indicated which bedroom was his and said he has a blue iPhone
12.  B. CHAVEZ said he shares a T-Mobile cell phone plan with
his mother and that he thought his brothers were on separate

16

plans.  B. CHAVEZ stated the whole family shares an internet provider.

32.  B. CHAVEZ denied having child pornography on his phone or computer and denied seeing it at the house.  About 30 minutes into the interview, SA Alon asked B. CHAVEZ again whether there would be child pornography on his computer or phone.  In response, B. CHAVEZ said, "I plead the Fifth," and said he wanted to stay silent.  Investigators continued the interview as to other topics relating to the investigation.  This affidavit does not rely on any statements made by B. CHAVEZ after he indicated he wished to stay silent.

33.  During the search of the SUBJECT PREMISES, investigators seized three digital devices from the bedroom that B. CHAVEZ identified as his bedroom: a silver MacBook Air ("SUBJECT DEVICE 1"), a blue Apple iPhone 12 Pro ("SUBJECT DEVICE 2"), and a silver Microsoft Surface ("SUBJECT DEVICE 3") (collectively, the "SUBJECT DEVICES").  During the execution of the search warrant, when investigators were entering the residence, they gave verbal commands for the residents to come out.  B. CHAVEZ did not immediately come out of his room but only came out when SAs were in close proximity to his closed bedroom door.  During the search of the SUBJECT PREMISES, SUBJECT DEVICE 2 was discovered fully charged but powered off inside a folder in a dresser drawer next to B. CHAVEZ's bed. SUBJECT DEVICE 3 was found between the mattress and the box spring of B. CHAVEZ's bed.

17

D. **Investigators Seized Digital Devices Associated with B. CHAVEZ and the SUBJECT ACCOUNTS and Discovered Child Pornography Files**

34.   An HSI Computer Forensics Agent forensically extracted data from the SUBJECT DEVICES, which I reviewed as authorized by the October 2021 Warrant.  Each of the SUBJECT DEVICES were put in airplane mode and/or disconnected from the Internet during the extraction/imaging process to ensure no cloud data was accessed during the search of the devices.[9]

> 1.   Evidence Indicating B. CHAVEZ Is the User of the SUBJECT DEVICES

35.   During the review of the SUBJECT DEVICES, I found evidence linking B. CHAVEZ to the devices, including the following:

a.   SUBJECT DEVICE 1 is a Silver MacBook Air bearing serial number C02VQ0R1J1WK.  During the consensual interview, B. CHAVEZ provided the password for his laptop computer as "5kme185" which was used to successfully log onto SUBJECT DEVICE 1.  Law enforcement found additional evidence of ownership on this device, including digital images of B. CHAVEZ's passport, California's driver's license, and Chrome Saved Credit Cards with "Bryan Chavez" reported as the Name on Card.  The "Computer Name" of SUBJECT DEVICE 1 was reported as "Bryan's MacBook Air."

b.   SUBJECT DEVICE 2 is a blue Apple iPhone 12 Pro bearing serial number F17F43LA0D83.  During the consensual

---

[9] SUBJECT DEVICES 1 and 2 were placed into airplane mode prior to extracting/imaging their data.  SUBJECT DEVICE 3 was not placed in airplane mode, but it did not have a network connection while being imaged.

interview, B. CHAVEZ provided his phone number as 323-494-7057, which is the same number assigned to SUBJECT DEVICE 2. Also, during the interview, B. CHAVEZ voluntarily gave the passcode for SUBJECT DEVICE 2 as "5853," which was successfully used to unlock SUBJECT DEVICE 2. SUBJECT DEVICE 2 contained more than twenty photographs of B. CHAVEZ that appeared to be taken by B. CHAVEZ (also known as "selfies"). The device also contained photographs of identification cards bearing the name of B. CHAVEZ, including his California Driver's license and a work photo identification for the Behavioral Learning Network. Additionally, SUBJECT DEVICE 2 is reportedly named "Bryan's iPhone" with an Apple ID of "chavezbryan36@yahoo.com."

      c.   SUBJECT DEVICE 3 is a Silver Microsoft Surface tablet bearing serial number 058806144953. Investigators used the same PIN for SUBJECT DEVICE 2 (5853) to successfully unlock SUBJECT DEVICE 3. Reported under User Accounts was the User Name of "Bryan" with the Full Name of "Bryan Chavez."

      2.   <u>Child Pornography Is Found on the SUBJECT DEVICES</u>

    36.  During my search of the SUBJECT DEVICES, I identified approximately 114 images and 256 videos of suspected child pornography. I submitted these suspected child pornography files to NCMEC to determine whether these files included known child pornography. NCMEC confirmed that of these submitted files, approximately 15 images and 94 videos match known victims who were minors at the time the child pornography was produced. These known images of child pornography were found on SUBJECT

DEVICE 1 and SUBJECT DEVICE 2.  Additionally, approximately 36 files of suspected child pornography depicted apparent minors who have yet to be identified.[10]

37.  One additional partial video file found during the review of the forensic report of SUBJECT DEVICE 2 depicts an adult male licking the upper thigh of what appears to be a minor between the ages of approximately four and six years old, based on the estimated size of the minor's body.  The video is approximately 11 seconds long.[11]  The side of the adult male's face is visible and he resembles B. CHAVEZ.  The minor is only partially visible.  The minor is lying on a couch, and their legs and part of their hip area can be seen.  The minor is wearing multi-colored underwear, no pants, and red socks with cartoon-style tacos on them.[12]  It appears saliva is running down the minor's leg.  While the video likely does not meet the definition of child pornography, it does demonstrate a sexual interest in children.

---

[10] These files may be newer productions as some of them had not been seen before by NCMEC and others have only been seen several times.  These files contain apparent minors and offenders who have not yet been identified by law enforcement or NCMEC.

[11] It appears this is only a partial file and part of the data has been overwritten.  I also found two digital images which appear to be taken from this video.

[12] An image of the taco socks was shown to family members of B. CHAVEZ but none of them recognized the socks.  Investigators learned that B. CHAVEZ's minor niece lives with her parents in the converted garage space at the SUBJECT PREMISES.  The niece and her mother were present at the SUBJECT PREMISES during the search. Investigators searched the converted garage space for these socks and did not find them.

38.   SUBJECT DEVICE 1 contained a video file in a folder that, based on where it reportedly was stored in the device, appears to be associated with an August 2021 chat involving the ZOOM ACCOUNT (username "Alex Gee").  The file was found in the following filepath:[13]  \Users\bryanchavez\Documents\Zoom\2021-08-29 18.55.45 Alex Gee's Zoom Meeting 86401778276\.  According to NCMEC, this video is a match to known child pornography and depicts confirmed minors.

39.   On two of the SUBJECT DEVICES, investigators found links between the ZOOM ACCOUNT and B. CHAVEZ:

a.   An email message file reported to depict an email from November 26, 2018, from "Zoom <teamzoom@zoom.us>" to "Alex Gee[14] <batman118264@gmail.com>"[15] with the subject line of "Welcome to Zoom!"[16]  The batman118264@gmail.com account (GOOGLE ACCOUNT 3) is linked to B. CHAVEZ through an email message reported to be on a SUBJECT DEVICE from "Twitter <verify@twitter.com>" to "Bryan <batman118264@gmail.com>" with

---

[13] Based on my training and experience, I believe the filepath shows where on a device a file is located.

[14] This is the username for the ZOOM ACCOUNT.

[15] This is GOOGLE ACCOUNT 3.

[16] Because the date of this email is November 26, 2018, and it appears to be the date the ZOOM ACCOUNT was created, I am seeking contents of all wire and electronic communications associated with the ZOOM ACCOUNT which occurred between November 26, 2018 and the date of this warrant, as described in Attachment B-5, Section II.10a.  As described in further detail below, SUBJECT DEVICE 3 contained Zoom chats (involving users other than the ZOOM ACCOUNT) dating back to 2017 in which the users discussed wanting to rape babies.  Accordingly, it appears B. CHAVEZ has been accessing Zoom chats since at least 2017 in an effort to further his interest in child sexual exploitation.

the subject line of "New login to Twitter from Safari on Mac."
Bryan is B. CHAVEZ's first name.

      b.   A digital image, titled "IMG_0893.HEIC," which
appeared to depict a photo of computer screen during a Zoom
Meeting.  In this image, there are, multiple Zoom windows open
where the words "Gee's Zoom Meeting" and "Alex Gee (You)"[17] are
visible.

    40.   Law enforcement also discovered approximately 12 files
containing suspected child pornography reported to be on SUBJECT
DEVICE 3 in a file path associated with Twitter under the Users
folder for "Bryan":
Windows\Users\Bryan\AppData\Local\Packages\9E2F88E3.Twitter_wgeq
dkkx372wm\LocalState\627292675\.local_cache\Media\.  One of the
files is an image that depicts an apparent minor orally
copulating a penis.  The minor appears to be approximately under
10 years old.  The forensic data does not indicate the specific
Twitter username or account associated with these suspected
child pornography files.  However, investigators found evidence
on SUBJECT DEVICES 1 and 3 that B. CHAVEZ uses Twitter,
specifically through the TWITTER ACCOUNT ("New_EraKid").

      a.   An email message file depicting an email on
February 5, 2017, from "Twitter <verify@twitter.com>" with the
subject line of "New login to Twitter from Safari on iPhone" and

_____

    [17] In my training and experience, the reference to "(You)"
here indicates that who whoever was logged into the computer
depicted in the photograph was using the "Alex Gee" account (the
ZOOM ACCOUNT) at the time the photograph was taken.

the following text: "We noticed a recent login for your account @New_EraKid."[18]

      b.   An email message file depicting a July 18, 2018 email from "Twitter <verify@twitter.com>" to "Bryan <batman118264@gmail.com>" (GOOGLE ACCOUNT 3) with the subject line of "New login to Twitter from Safari on Mac" and the following text: "We noticed a recent login for your account @New_EraKid."  The email indicated the approximate location of the login was Los Angeles, California, based on the IP address.

41.  I believe the above files and their locations on the SUBJECT DEVICES indicate the files were uploaded and/or received via Zoom and Twitter, further showing probable cause that evidence of the SUBJECT OFFENSES will be found in the ZOOM ACCOUNT and the TWITTER ACCOUNT.

42.  Other child pornography files were located elsewhere on the SUBJECT DEVICES.

      3.   <u>Additional Evidence of Child Pornography and Communications Relating to Child Exploitation</u>

43.  During the review of the SUBJECT DEVICES, I found additional evidence linking the SUBJECT DEVICES, the SUBJECT ACCOUNTS, B. CHAVEZ, and references to child exploitation.  This evidence included chats in which users discussed their sexual

---

[18] Because this email is reportedly dated February 5, 2017, and indicates that the TWITTER ACCOUNT was an existing account at that time, I am seeking contents of all wire and electronic communications associated with the TWITTER ACCOUNT which occurred between November 5, 2016 (approximately three months before the date of the email) and the date of this warrant, as described in Attachment B-3, Section II.10a.

interest in children, and molesting children.  Several examples
are listed below.

> a.   *Child Exploitation Linked to the SKYPE*
> *ACCOUNT, GOOGLE ACCOUNT 2, and GOOGLE*
> *ACCOUNT 3*

44.  Under Skype Activity in SUBJECT DEVICE 1, the username
"alex217543" (the SKYPE ACCOUNT) was reported as the Profile
Name.  As described below, the user of the SKYPE ACCOUNT engaged
in chats discussing the sexual exploitation of children.  The
messages from the SKYPE ACCOUNT were outbound, suggesting that
the account was used by the user of SUBJECT DEVICE 1.

45.  SUBJECT DEVICE 1 reportedly included an email message
file depicting an email from "Microsoft Account – Unmonitored
Email <unmonitored@microsoft.com>" to "<Batman118264@gmail.com>"
(GOOGLE ACCOUNT 3) with the subject line of "Your account
recovery request for alex217543."  This email indicates that
GOOGLE ACCOUNT 3 is associated with the SKYPE ACCOUNT.  Under
Apple Accounts for Local Account "bryanchavez" on SUBJECT DEVICE
1, GOOGLE ACCOUNT 3 was reported as a User Name, further
evidence linking GOOGLE ACCOUNT 3 to B. CHAVEZ.

46.  On SUBJECT DEVICE 3, the Skype Names "alex217543" (the
SKYPE ACCOUNT) and "live:chavezbryan1996" were reportedly
associated with the "chavezbryan1996@gmail.com" account (GOOGLE
ACCOUNT 2).  The forensic report showed that the Profile for the
SKYPE ACCOUNT was created on June 27, 2016.[19]

---

[19] Because the forensic review of the SUBJECT DEVICES
revealed chats involving the SKYPE ACCOUNT dating back to July
                                    *(footnote cont'd on next page)*

47.   In a 2018 Skype chat reported on SUBJECT DEVICE 1, the user of the SKYPE ACCOUNT claimed to have molested his or her niece.

48.   In a 2017 Skype chat reported on SUBJECT DEVICE 1, user "alex217543" (the SKYPE ACCOUNT) and another user discussed sexually assaulting babies (typos in original):

> justlooking114: How's that baby loving cock?
>
> alex217543: Loving babies still man
>
> alex217543: How's ur pedo cock
>
> justlooking114: My cock needs to share new born hole with you fucker
>
> alex217543: Mhmm fuck yes man
>
> justlooking114: My white cock making that little fucker cry
>
> alex217543: Mhmm I fuckibg missed perving with you man

49.   In a 2019 chat, the user of the SKYPE ACCOUNT described his or her sexual interest in girls ("g") ages newborn to five ("0-5"), and boys ("b") ages newborn to 12 ("0-12"):

> alex217543: into
>
> blackstudla: yng, taboo, no limits. you?
>
> alex217543: yng 0+
>
> blackstudla: b or g or both?

22, 2016, and the SKYPE ACCOUNT Profile was created on June 27, 2016, I am seeking contents of all wire and electronic communications associated with the SKYPE ACCOUNT and GOOGLE ACCOUNTS 2 and 3 (the email addresses associated with the SKYPE ACCOUNT) which occurred between June 27, 2016 and the date of this warrant, as described in Attachments B-1 and B-2, Section II.10a.

<u>alex217543</u>: g 0-5 b 0-12

50.   In a Skype chat reported on SUBJECT DEVICE 1, the user of the SKYPE ACCOUNT also claims to have molested a niece.  The following is an excerpt from a chat that took place on or about January 19, 2018, and does not reflect the entire contents of the chat log (typos in original):

<u>soramaro989</u>: what have u all done with your niece

<u>alex217543</u>: Everything

    b.   *Evidence Relating to Kik Messenger and KIK ACCOUNT 1*

51.   As described above, the Cybertip reported that child pornography was uploaded and distributed by KIK ACCOUNT 1, and GOOGLE ACCOUNT 1 was listed in the subscriber information for KIK ACCOUNT 1.  I found evidence on at least one of the SUBJECT DEVICES linking the devices to Kik Messenger in general, and KIK ACCOUNT 1 and GOOGLE ACCOUNT 1 in particular:

a.   A search of the forensic image for SUBJECT DEVICE 1 for the term "slifer999" (username for KIK ACCOUNT 1) resulted in approximately 19 results.

b.   In SUBJECT DEVICE 1, the username "slifer" was reported as a User Name under Chrome Logins.  This username is similar to that of KIK ACCOUNT 1 ("slifer999").

c.   A search of the forensic images/extractions for SUBJECT DEVICES 1 and 2 for the phrase "hermanlogo23@gmail.com" (GOOGLE ACCOUNT 1) resulted in approximately 56 results on SUBJECT DEVICE 1, and approximately four results on SUBJECT

DEVICE 2.  This is the email account included in the subscriber information for KIK ACCOUNT 1.

d.    I also found evidence of a second Kik account (KIK ACCOUNT 2, with screenname/username "pouchair") reported on SUBJECT DEVICE 1: an email message file depicting an email from July 31, 2018, from "Kik <no-reply@kik.com>" to "<batman118264@gmail.com>" (GOOGLE ACCOUNT 3) with a subject line of "Welcome to Kik! Confirm your details inside…" and email content that references the Kik username "pouchair."  In my training and experience, Kik is an application frequently used to distribute child pornography.  This email appears to show KIK ACCOUNT 2 was created on July 31, 2018.  I am seeking contents of all wire and electronic communications associated with KIK ACCOUNT 2 which occurred between July 31, 2018, and the date of this warrant, as described in Attachment B-4, Section II.10a. In light of evidence that B. CHAVEZ uses a wide range of electronic communication applications (including to discuss child exploitation as early as 2017, as described above), and evidence that he used Kik Messenger to upload and distribute suspected child pornography, I believe there is probable cause that evidence of the SUBJECT OFFENSES will also be found on this second KIK ACCOUNT.

      *c.   Search History and Chats Describing Rape,*
          *Sexual Assault, and Murder of Babies*

52.  The forensic report of SUBJECT DEVICE 2 also contained a digital image which appears to depict an Omegle search on a computer.[20]  Under the box for "What do you want to talk about?" were the following terms: perv[21], nepi[22], lil[23], yng, infants, young, ped, pedo[24], babies, toddler, yung[25], premie[26], preschool, preschoole[r][27], newborn, newborns, raping.

53.  Also, during the forensic review, I viewed reports of electronic communications where individuals discussed a sexual interest in children, including talk of raping and killing babies.  During the search of SUBJECT DEVICE 3, law enforcement found reports of Zoom message files between various users.  One Zoom chat reported on SUBJECT DEVICE 3 appeared to take place on or about November 3, 2017, between user "hey pervs" and user

---

[20] Omegle is an online chat website that allows users to communicate with each other anonymously, including by text and video conferencing.

[21] Based on my training and experience, "perv" is short for "pervert."

[22] Based on my training and experience, "nepi" is short for "nepiophilia."

[23] Based on my training and experience, "lil" is short for "little."

[24] Based on my training and experience, "ped" and "pedo" are short for "pedophile."

[25] Based on my training and experience, "yng" and "yung" are short for "young."

[26] Based on my training and experience, "premie" is a term for a premature baby.

[27] In the image, the computer mouse was over the end of this word, covering what likely seems to be the "r" in "preschooler."

"Ungodly sublime."[28]  This chat appears to begin with both users using written messages to communicate.  However, during the course of the conversation, it appears one user, "hey pervs," may have transitioned to voice chat and "Ungodly Sublime" continued to type messages, because only Ungodly Sublime's messages are visible and "hey pervs" asks "can you hear me?" to which "Ungodly Sublime" replies, "when you hold it" and then "the mic" (apparently referring to a microphone).  The following is an excerpt from this part of the chat and does not reflect the entire contents of the chat log (typos in original):

> Ungodly Sublime: wanna kill some babies with you. kiss as they're gaming for air
>
> [. . .]
>
> Ungodly Sublime: what do you like most about yng?
>
> [. . .]
>
> Ungodly Sublime: same, plus I love pain and screams
>
> Ungodly Sublime: i wanna rape and snuff[29] a basement full of babies and toddlers
>
> Ungodly Sublime: how do you wanna kill them with me?

54.    In another Zoom chat reported on SUBJECT DEVICE 3 in 2017, one user, "bbyluv," asks: "any exp?"[30]  In response,

---

[28] The user "hey pervs" claims to be from "LA" (that is, Los Angeles) and be 21 years old and 5'9."  This information is consistent with B. CHAVEZ's location, age, and description at the time of this chat.

[29] Based on my training and experience, "snuff" means kill.

[30] Based on my training and experience, "exp" is short for "experience," that is, having committed contact sexual offenses against children.

another user, "bby rape," says "yes [. . .] my niece [. . .]
shes 6months."[31]  In another chat, this user claims to live in
Torrance, California.[32]

55.  Other than what has been described herein, to my
knowledge the United States has not attempted to obtain the
contents of the SUBJECT ACCOUNTS by other means.

## V.   BACKGROUND ON EMAIL, SOCIAL MEDIA, AND ELECTRONIC COMMUNICATION SERVICES AND THE PROVIDERS

56.  In my training and experience, I have learned that
providers of email, social media, and electronic communication
services offer a variety of online services to the public.
Providers, like the PROVIDERS, allow subscribers to obtain
accounts like the SUBJECT ACCOUNTS.  Subscribers obtain an
account by registering with the provider.  During the
registration process, providers generally ask their subscribers
to provide certain personal identifying information when
registering for an email or social media account.  Such
information can include the subscriber's full name, physical

---

[31] At the time this chat apparently took place, B. CHAVEZ's
niece, who was present during the execution of the search
warrant, was about 6 months and a week old.  After viewing chats
alleging abuse of a "niece," SAs contacted Juan Chavez, the
father of the niece, to advise him of these claims and ask to
forensically interview the niece.  Juan Chavez declined to have
the niece interviewed, saying the niece was never alone so there
would not have been opportunity for abuse to take place.  The
Department of Child and Family Services was involved in this
investigation during the execution of the search warrant.

[32] To my knowledge, B. CHAVEZ has not lived in Torrance,
California, but based on my training and experience, individuals
do not always give an accurate location when communicating with
others online.

address, telephone numbers and other identifiers, alternative
email addresses, and, for paying subscribers, means and source
of payment (including any credit or bank account number).  Some
providers also maintain a record of changes that are made to the
information provided in subscriber records, such as to any other
email addresses or phone numbers supplied in subscriber records.
In my training and experience, such information may constitute
evidence of the crimes under investigation because the
information can be used to identify the user(s) of an account.

57.  Therefore, the computers of the PROVIDERS are likely
to contain stored electronic communications and information
concerning subscribers and their use of the PROVIDERS' services,
such as account access information, email or message transaction
information, and account application information.  In my
training and experience, such information may constitute
evidence of the crimes under investigation because the
information can be used to identify the user(s) of the SUBJECT
ACCOUNTS.

58.  A subscriber of the PROVIDERS can also store with the
PROVIDERS files in addition to emails or other messages, such as
address books, contact or buddy lists, groups, social network
links, calendar data, pictures or videos (other than ones
attached to emails), notes, and other files, on servers
maintained and/or owned by the PROVIDERS.  In my training and
experience, evidence of who was using an account may be found in
such information.

31

59.  In my training and experience, email, social media, and electronic communication providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email, social media, and electronic communication providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the SUBJECT ACCOUNTS.

60.  In my training and experience, email, social media, and electronic communication users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of email, social media, and electronic communication services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the

32

communications.  In my training and experience, such information
may constitute evidence of the crimes under investigation
because the information can be used to identify the user(s) of a
SUBJECT ACCOUNT.

61.  In my training and experience, providers also keep a
record of search queries run by the user of the account, whether
searches within the services of the provider for persons,
content, or other accounts (such as if a user is trying to find
the account of an acquaintance), or broader Internet searches.
In some instances, providers may also keep records of which
websites or contents were "clicked on" as a result of these
searches.  This information is helpful in the context of the
case to show the topics about which the user was trying to
obtain more information or conduct research, and is relevant for
"user attribution" evidence, analogous to the search for
"indicia of occupancy" while executing a search warrant at a
residence.

62.  Users of accounts are often required to include an
email account as well as a phone number in subscriber records.
The email account may be an email account hosted at the same
provider, or an account at a different provider.  The email
account is referred to by a number of names, such as a secondary
email account, a recovery email account, or an alternative email
account or communication channel.  That email account is often
used when the identity of the user of the primary account (here,
the SUBJECT ACCOUNTS) needs to be verified, for example if a

password is forgotten, so that the provider can confirm that the person trying to access the account is the authorized user of the account.  Similarly, the telephone number used in subscriber records is often used to send a passcode via text (or "SMS") that must be presented when trying to gain access to an account, either in a similar scenario where a user forgot his or her password, or when users implement what is referred to as "two-factor authentication" (where the password is one factor, and the passcode sent via text message to a mobile device is a second).  In either scenario, the user of a primary email account and a secondary email account or phone number listed in subscriber records are very often the same person, or at least are close and trusted and/or working in concert.  That is because access to either the secondary email account or to the phone number listed in subscriber records can allow access to the primary account.

63.  The subscriber will also generally need to use a password that will allow the user to gain access to the account. Many providers do not store the password directly, rather they use an algorithm (often referred to as a "hashing" algorithm) that is performed on the password and generates a new random of string of numbers and characters, which is what the provider may store.  When a user enters his or her password, the hashing algorithm is performed on the password before it is presented to the provider, and the provider will verify the hash value for the password (rather than the password itself) to authorize

34

access to the account.  As an added security feature, some providers insert additional text before or after the password, which additional text is referred to as "salting" the password. The hashing algorithm is then performed on the combined password and salt, which is the hash value that will be recognized by the provider.  Alternatively or in addition to passwords, users may be required to select or propose a security question, and then provide an answer, which can be used to substitute for a password or to retrieve or reset a user's password.

64.  Providers of email, social media, and electronic communication services often maintain, have access to, and store information related to the location of the users of accounts they service.  That information may be obtained by the provider in a number of ways.  For example, a user may access the provider's services by running an application on the user's phone or mobile device, which application has access to the location information residing on the phone or mobile device, such as Global Positioning System ("GPS") information.  It may also be accessible through "check-in" features that some providers offer that allow users to transmit or display their location to their "friends" or "acquaintances" via the provider.

## VI.  BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDERS

65.  I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or

screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal activity.  Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account.  Therefore, the contents of a given account, including the email addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account.  For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDERS to turn over all information associated with the SUBJECT ACCOUNTS with the date restriction included in Attachments B-1, B-2, B-3, B-4, and B-5 for review by the search team.

36

66.  Relatedly, the government must be allowed to determine whether other individuals had access to the SUBJECT ACCOUNTS. If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

67.  I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachments B-1, B-2, B-3, B-4, and B-5, is necessary to find all relevant evidence within the account.

68.   This application seeks a warrant to search all responsive records and information under the control of the PROVIDERS, which is subject to the jurisdiction of this court, regardless of where the PROVIDERS have chosen to store such information.

a.   I make that request because I believe it might be impossible for a provider to authenticate information taken from the SUBJECT ACCOUNTS as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from the SUBJECT ACCOUNTS.

b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore,

38

would ensure that the government can satisfy its Brady
obligations and give the defendant access to evidence that might
be used in his or her defense.

### VII. __BACKGROUND ON KIK MESSENGER__

69.  MediaLab owns Kik Messenger ("Kik"), a free instant
messenger application for mobile devices.  Kik is available on
several mobile device platforms, including iOS, Android, and
Windows Phone operating systems.  The Kik application utilizes
the Internet connection through the mobile devices' cellular
data plan or through Wi-Fi to send and receive messages, photos,
videos, sketches, mobile webpages, and other content transmitted
by users through the Kik application.

70.  Kik allows its users to register a user account
without providing a telephone number and prevents users from
being located on the service through any information other than
their chosen, unique Kik username.  At the completion of the
account registration, the user is allowed to start communicating
with other Kik users.  Searching for specific Kik users can only
be performed using a Kik user's registered username; searches by
phone number or email address cannot be performed.  Entering the
unique Kik username through the application's search field
yields potential matches with which the user can select to start
communicating.

71.  Kik usernames are unique in that more than one user
cannot have the same username and once a username is registered
to a particular user, the alphanumeric combination comprising

the username cannot be used by any other person.  Searching for the unique username is the only way to find a specific user. Each Kik user, when signed into their username, can choose a display name.  The display name does not need to match the username, but it can if the user so chooses.  When users choose the display name tied to their username, the display name can be the same as other display names.  While a username is used for finding a user, once users connect, the display name for each user is what is shown in the chats between and among users. Based on my training and experience, I know that chat applications are often used to communicate with others, including during the commission of crimes.  In particular, I know that Kik has become a chat application popular with individuals who have a sexual interest in children and images of children to discuss their interest with other like-minded individuals, including to share images and videos of child pornography.

### VIII.    SERVICES PROVIDED BY GOOGLE LLC

72.  Based on a review of information provided by Google regarding its services, information provided by other law enforcement officers, and my training and experience, I am aware of the information contained in this section of the affidavit regarding Google.

73.  Google provides a variety of online services, many through Google Accounts, including email, document storage, mobile operating systems, translation services, software coding

40

tools, malware analysis, social media accounts, applications development tools, video and photograph sharing and storage, web feed management tools, personalized home pages, news aggregation tools, a Google Account "dashboard" tool, an online retail storefront offering applications for free and for sale, website analytic tools, calendars, web browsers, mapping tools, location tracking tools, and telephone and voicemail transcription to the public.

74.  Google Calendar (Google's appointment book service) allows users to create events or RSVP to events created by others.  A single Google Account can set up multiple calendars. A calendar can be shared with other Google Accounts by the user or made public so anyone can access it.  Users also have the option to sync their device calendar so it is stored in Google Calendar.

75.  Google also offers numerous services which enhance the user's Internet experience, including Google Dashboard, Google News, and Google Groups.  Google News and the now-discontinued Google Reader are website feed aggregators that allowed a user to view website articles and news in one centralized location. Google Groups are email groups whereby one person can send an email to an email address that serves as the "group," and the message or email is either or both posted to a centralized location and/or sent to everyone who is currently subscribed to the group via email; each group is generally set up using a Google account.

76.   Google also offers a service called Google Hangouts (which is transitioning to Google Chat), which allows Google users to communicate by means of video calls, phone or audio calls, or written messages.

77.   Google also offers its own web browser -- Google Chrome -- which can be used instead of other web browsers such as Microsoft Internet Explorer or Mozilla Firefox.  Google Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access.  If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.  Users who have a Google Account can use Google Chrome on multiple devices and can decide which information "syncs" or synchronizes across multiple devices that are running Google Chrome.  Devices that can be synced include computers, Google's own computers called Chromebooks, devices running Google's own Android operating system, or iPhones or iPads (devices made by Apple, Inc. that use Apple's proprietary operating systems).  Users have the option to sync all data across multiple devices, or only certain information by checking certain boxes.

78.   Users can obtain a Google Account by registering with Google.  During the registration process, Google generally asks subscribers to provide certain personal identifying information when registering.  Such information can include the subscriber's

full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  Google may also maintain a record of changes that are made to the information provided in subscriber records, such as to any other email addresses or phone numbers supplied in subscriber records.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

79.  Evidence of who it is that a user of an account has contacted and for what purpose can also reside in the information likely stored on a SUBJECT ACCOUNT at Google.  For example, photographs can be stored not only as attachments to emails, but they can be linked to a particular contact stored in connection with an email account, they can be stored in connection with a particular "friend" or event on a Google+ account, or they can be stored in a Google Photos (formerly Picasa) web album.  Albums can be compiled for a particular trip or occasion, documenting who was present, when it took place, and where it was -- for example by recovering location information that is sometimes stored in metadata, or what is referred to as "EXIF data" on digital photographs.  Likewise, personal videos can be uploaded to or downloaded from video services such as Google's YouTube.  All of this data can assist

43

in identifying the true identity of the account user and persons with whom the user of the account has been in contact.

80.  Aside from photos, the discontinued Google+, Google Plusone, and iGoogle services were social networking services similar to Facebook.  Data residing on Google+, Google Plusone, and iGoogle accounts is likely to provide information regarding the true identity of the person(s) using a SUBJECT ACCOUNT, the identities of persons with whom the user of a SUBJECT ACCOUNT has been in contact, the nature of those contacts, and whether any such contacts were related to the subject matter of the investigation described above.  Furthermore, a user's history that relates to web browsing, web searches, and certain activity related to Google services or applications (or "apps") are stored in an account's Google History, or Google Web & App Activity.

81.  In addition to storing photographs, calendars, and other evidence related to social media, a subscriber can also sign up for other services at Google, such as Google Drive and Google Keep, which allow users to store any kind of documents. Google Drive is a cloud storage service that allows users to store an unlimited number of documents created by Google applications such as Google Docs, Google Sheets, Google Forms, and Google Slides. Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit.  Users can set up their personal devices to automatically back up files to Google Drive.  Google Drive

allows users to share their stored files and documents with up
to 100 people and grant those with access the ability to edit or
comment.  Google maintains records of changes to documents
edited in Google applications.  Google Keep is a cloud-based
notetaking service that lets users take notes and share them
with other Google users to view, edit, or comment.

82.  A subscriber can also store with Google files in
addition to emails or other messages, such as address books,
contact or buddy lists, groups, social network links, calendar
data, pictures or videos (other than ones attached to emails),
notes, and other files, on servers maintained and/or owned by
the PROVIDER.  In my training and experience, evidence of who
was using an account may be found in such information.

83.  Providers like Google typically retain certain
transactional information about the creation and use of each
account on their systems.  This information can include the date
on which the account was created, the length of service, records
of login (i.e., session) times and durations, the types of
service utilized, the status of the account (including whether
the account is inactive or closed), the methods used to connect
to the account, and other log files that reflect usage of the
account.  In addition, email and social media providers often
have records of the Internet Protocol ("IP") address used to
register the account and the IP addresses associated with
particular logins to the account.  Because every device that
connects to the Internet must use an IP address, IP address

information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

84.  Google also collects and retains data about the location from which Google Account services are accessed on any mobile device.  According to Google, this location data may be associated with the Google Account signed-in or registered to the device if Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking.  The data retained includes precision location data, like latitude and longitude coordinates derived from GPS.

85.  In addition, Google Maps provides a mapping tool that allows users to search for addresses or points of interest, save locations (such as their home and work locations), create custom maps, make changes and edits to public places, "star" locations, and create private labels for locations.  Users can share their real-time location with others through Google Maps by using the Location Sharing feature.  Users could find and plan an itinerary using the discontinued Google Trips, whose functionality is now part of Google Travel.  Google Location History provides GPS location information.  All of these services can be used to identify where an individual is and has been physically located.  Google also in some instances maintains records of the nearby wireless or "Wi-Fi" access points (that can be used to connect to the Internet) or the

cellular towers connected to a device that is accessing a Google Account.

86.  Google offers services which interpret and translate text, including Google Translate (which allow users to paste text in one language that will be translated into another) and Google Translator Toolkit (which includes more functionality and collaboration), which can translate text in over 100 languages. The translation service is Internet-based, so it can be used by the user of the account to translate emails received as well as websites visited.

87.  Over the last several years, Google has developed a number of mobile telephone and voicemail technologies, including the development of the Android mobile operating system, Android Market, Google Voice, and the discontinued Google Talk.  The Android operating system is used on the majority of the world's touch-screen mobile devices and smartphones, and facilitates the downloading and running of games and applications, sending of text and voice messages, connecting to and searching the Internet, and providing of GPS and location services, camera services for the taking of photographs and videos (including video calling), clock and calendar services, and email services, and storing of contact lists and documents.  The Google Play service provides the virtual storefront at which applications can be downloaded and updated.  I know from experience that Android applications including these are generally downloaded from the Android Market and Google Play services.  Through

47

Google Voice, users can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward SMS and MMS messages from a web browser, mobile phone, or landline.  Google Voice also includes a voicemail service.  Google Talk was an instant messaging service that provided both text and voice communication.

88.  Google also uses "unique application numbers," which Google uses to record information such as the operating system type and the application version number used to access Google by a particular device.  Google maintains these unique application numbers to track and collect information related to a particular device accessing Google services, which is recognized when updating Google services or software on a device using a Google Account.

89.  Google also now offers users the ability to exercise certain control over email messages, for example by allowing users to send expiring messages, to require a recipient to insert a password to open a message, to retract access to a sent message, or to control whether a recipient can forward a message.

90.  Depending on whether a user of a Google Account implemented Google's two-factor authentication system (which can require the user to enter both a username and password and a code sent to one's cell phone), Google may also have authentication logs of when the user successfully authenticated or identified him- or herself when logging into an account.

Similarly, for certain mobile devices, a password for the specific "app" installed on the mobile device may be generated and used to maintain access.

91.   In some cases, users may communicate directly with Google about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Providers like Google typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

## IX.   SERVICES PROVIDED BY TWITTER, INC.

92.   Based on a review of information provided by Twitter regarding its services, information provided by other law enforcement officers, and my training and experience, I am aware of the information contained in this section of the affidavit regarding Twitter.

93.   Twitter owns and operates a free-access social-networking website of the same name that can be accessed at http://www.twitter.com, through Twitter's applications, or using a compatible third-party application.  Twitter allows its users to create their own profile pages, which can include a short biography, a photo, and location information.  Twitter also permits users to create and read 280-character messages called "Tweets," and to restrict their "Tweets" to users whom they approve.

49

94.   Upon creating a Twitter account, a Twitter user must create a unique Twitter username and an account password, and the user may also select a different name of 20 characters or fewer to identify their Twitter account.  The Twitter user may also change this username, password, and name without having to open a new Twitter account.

95.   Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter.  This information may include the user's full name, email addresses, physical address, date of birth, gender, hometown, occupation, and other personal identifiers.  For each user, Twitter may also retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up.  Twitter may also maintain a record of changes that are made to the information provided in subscriber records, such as additional email addresses or phone numbers supplied by a user.

96.   A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile and can also change the profile background or theme for his or her account page.  Twitter profiles can include a location, website and birth date entered by the user.  Twitter users can also post "bios" of 160 characters or fewer to their profile pages.

97.   In addition, Twitter keeps IP logs for each user. These logs contain information about the user's logins to

50

Twitter including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

98.  As noted above, Twitter users can use their Twitter accounts to post "Tweets" of 280 characters or less (this limit was originally 140 characters).  Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter.  Twitter users can also "favorite," "retweet," or reply to the Tweets of other users.  In addition, when a Tweet includes a Twitter username (often preceded by the @ sign) Twitter designates that Tweet a "mention" of the identified user.  In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted" the user's own Tweets, as well as a list of all Tweets that include the user's username (i.e., a list of all "mentions" and "replies" for that username).

99.  Twitter users can also include photographs or images in their Tweet and each Twitter account is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

100. Additionally, Twitter users can opt-in to include location data in their Tweets, which will reveal the user's locations at the time they post each Tweet.

101. When Twitter users want to post a Tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co.  This link service also measures how many times a link has been clicked.

102. A Twitter user can "follow" other Twitter users, which means subscribing to those users' Tweets and site updates.  Each user profile page includes a list of the people who are following that user (i.e., the user's "followers" list) and a list of people whom that user follows (i.e., the user's "following" list).  Twitters users can "unfollow" users they previously followed, and they can also adjust the privacy settings for their profile so that their Tweets are visible only to the people whom they approve.  A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter.  Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

103. In addition to posting Tweets, a Twitter user can send Direct Messages ("DMs") to one of their followers.  These messages are typically visible only to the sender and the recipient.  As of January 2012, Twitter displays only the last 100 DMs to a particular user, but older DMs are stored in Twitter's database.

104. If a Twitter user does not want to interact with another user on Twitter, that user can "block" the second user from following his or her account.

105. Twitter also includes a search function that enables its users to search all public Tweets for keywords, usernames, or subject, among other things.  A Twitter user may save up to 25 past searches.

106. In some cases, users may communicate directly with Twitter about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Twitter typically retain records about such communications, including records of contacts between the user and Twitter's support services, as well as records of any actions taken by Twitter or user as a result of the communications.

107. As explained herein, information stored in connection with a Twitter account may provide information that can be used to identify the user(s) of a SUBJECT ACCOUNT.  For example, profile contact information, communications, "tweets" (status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may include evidence of who used or controlled a SUBJECT ACCOUNT at a relevant time.  An account's account activity can also contain information about how, when, or where the account was accessed or used, including the IP addresses from which users accessed their accounts, along with the time and date information, as well as geo-location

information.  In my training and experience, such information

may constitute evidence of the crimes under investigation

because the information can be used to identify the user(s) of a

SUBJECT ACCOUNT.

### X.   CONCLUSION

108. Based on the foregoing, I request that the Court issue

the requested warrant.  The government will execute this warrant

by serving the warrant on the PROVIDERS.  Because the warrant

will be served on the PROVIDERS, which will then compile the

requested records at a time convenient to it, reasonable cause

exists to permit the execution of the requested warrant at any

time in the day or night.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
July, 2022.


_____
UNITED STATES MAGISTRATE JUDGE

54